UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


EDWIN J. WILLIAMS,

                    Plaintiff,

                                        Case No.: 8:09-cv-784-T-33TGW
v.

H. LEE MOFFITT CANCER CENTER AND
RESEARCH INSTITUTE, INC.,

                    Defendant.
_____/

### ORDER

     This matter comes before the Court pursuant to Defendant H. Lee Moffitt Cancer Center and Research Institute, Inc.'s Motion for Summary Judgment (Doc. # 29), which was filed on October 8, 2010.  Plaintiff Edwin J. Williams filed his Response in Opposition (Doc. # 31) on October 22, 2010.  In this employment discrimination case, Mr. Williams alleges that he was passed up for a promotion and later terminated, based on discriminatory motives.  In addition, he claims that he was subjected to a hostile work environment and retaliation.  For the reasons that follow, this Court grants the Motion for Summary Judgment.

-1-

I.   **Background**

   A.   **Employment Overview**

On September 6, 2005, Moffitt hired Mr. Williams[1] as a Research Assistant in its Lifetime Screening Cancer Center. (Pl. at 20, 73, Exh. 4; Durham Aff. at ¶ 2; Seijo Aff. at ¶ 2).   Shortly after he was hired, Mr. Williams received a copy of Moffitt's Employee Handbook, which included a section on Moffitt's anti-discrimination and harassment policies.   (Pl. at 85-86, 153-159, Exh. 7, 12).   Mr. Williams understood that he could report any discrimination or harassment to Moffitt's Department of Human Resources. (Pl. at 198).

One of Mr. Williams' primary duties as a Research Assistant was to assist the Research Associate, Adys Fernandez. (Pl. at 77-78, 94, 218-19; Exh. 5, 6; Durham Exh. A.; Durham Aff. at ¶ 3; Seijo Aff. at ¶ 2).   Mr. Williams also reported to Tissue Core Liquids Section Team Lead Dr. Mei Huang and manager Edward Seijo.[2]   (Pl. at 79-83; Durham

---

   [1] Pursuant to his Amended Complaint and deposition transcript, Mr. Williams was born in 1949, and his race is Indian.   (Pl. at 20; Doc. # 16 at 1-2).

   [2] According to Amy Durham, Moffitt's Director for Strategic Workforce Management, Ms. Fernandez was born in 1964, and her race is Hispanic; Dr. Huang is a female, born in 1964, and her race is

-2-

Aff. at ¶ 4).

**B.   <u>Performance Evaluations</u>**

Mr. Williams received two performance evaluations during his employment at Moffitt. On December 15, 2005, Mr. Williams received an evaluation appraisal that covered his first ninety days with Moffitt. (Pl. at 132, Exh. 11). His rating on this evaluation indicated that he was meeting expectations. (Pl. at 132-33, Exh. 11).

Approximately six months later, on June 21, 2006, Mr. Williams received his first Annual Evaluation. (Pl. at 129-30, Exh. 9, 10). Again, he received an overall "achieving expectations" rating, which was signified by a numerical score of 3.5 out of 5. (Pl. at 129-20, Exh. 9). However, the Annual Evaluation contained numerous comments regarding areas in which Mr. Williams should improve. (Pl. Exh. 9, 10; Seijo Aff. at ¶ 3, 4). Particularly, the Annual Evaluation stated that Mr. Williams "need[s] to show a more positive attitude" and "realize that body language and tone of voice can often be misinterpreted and lead to work place tension." (Pl. at 129, Exh. 9, 10; Seijo Aff. at ¶ 3).

───────────────

Asian; and Mr. Seijo was born in 1968, and his race is Hispanic. (Durham Aff. at ¶ 1, 3-4).

Additionally, the Annual Evaluation noted that Mr. Williams "needs to show a more positive attitude when faced with challenging problems.  Concerns need to go to Team Lead first, not . . . other staff members." (Pl. at 129, Exh. 9, 10; Seijo Aff. at ¶ 3).

### C.   **Meeting Regarding Annual Evaluation**

On June 30, 2006, Mr. Seijo and Dr. Huang met with Mr. Williams to discuss his Annual Evaluation and the areas in which Mr. Williams needed to show improvement. (Pl. at 182, Exh. 15; Durham Aff. at ¶ 4; Seijo Aff. at ¶ 4). Specifically, they focused on Mr. Williams' communication skills, his attitude towards constructive criticism, and the importance of observing the chain of command.  (Pl. Exh. 15).  Mr. Williams was also explicitly warned that if he did not work on these areas, Moffitt would take more severe actions.  (Pl. Exh. 15).  On July 3, 2006, Dr. Huang e-mailed Mr. Williams to document their meeting.  (Pl. at 181, Exh. 15).

### D.   **Thirty Day Employment Improvement Plan**

Dr. Huang, Mr. Seijo, and Moffitt Employee Relations and Retention Manager Amy Durham met on September 5, 2006, to discuss the need to take more formal disciplinary action

-4-

regarding Mr. Williams' continuing issues.  (Durham Aff. at ¶ 1, 5; Seijo Aff. at ¶ 5).   During this meeting, they decided to place Mr. Williams on a Thirty Day Employment Improvement Plan as a result of his continued insubordinate behavior and inability to interact appropriately with his co-workers and supervisors. (Durham Aff. at ¶ 5; Seijo Aff. at ¶ 5).

Dr. Huang and Mr. Seijo placed Mr. Williams on the Thirty Day Plan on September 21, 2006.  (Pl. at 184-85, Exh. 16; Durham Aff. at ¶ 6; Seijo Aff. at ¶ 6).   It listed a number of incidents which led to its issuance.  (Pl. Exh. 16).   Pursuant to the Thirty Day Plan, Mr. Williams was required to attend weekly meetings with Dr. Huang or Mr. Seijo and to complete weekly personal performance assessments.  (Pl. Exh. 16; Durham Aff. at ¶ 6; Seijo Aff. at ¶ 6).   Moffitt also warned Mr. Williams that if his performance did not improve, it would take further disciplinary action, up to and including termination.  (Pl. at 185, Exh. 16; Durham Aff. at ¶ 6; Seijo Aff. at ¶ 6).

### E.   Mr. Williams' Application for Team Lead

On or about September 26, 2006, Mr. Williams spoke to Ms. Durham and alleged that he was placed on the Thirty Day

Plan to "mar [his] chances of promotion." (Pl. at 33; Durham Aff. at ¶ 6, Exh. C). This was the only complaint Mr. Williams made to Ms. Durham. (Durham Aff. at ¶ 6). According to Mr. Williams, he applied for a promotion to a Team Lead position on September 18, 2006. (Pl. at 33). Mr. Williams failed to present any evidence that Dr. Huang or Mr. Seijo knew about his application when they placed him on the Thirty Day Plan. (Pl. at 222-23).

Notably, Dr. Huang, Mr. Seijo, and Ms. Durham decided to place Mr. Williams on the Thirty Day Plan at their September 5, 2006, meeting, which was weeks prior to his application. (Durham Aff. at ¶ 5; Seijo Aff. at ¶ 5). Moffitt investigated Mr. Williams' complaint regarding the timing of his Thirty Day Plan and his application for the Team Lead position, but found no evidence to substantiate Mr. Williams' assertion that the Thirty Day Plan was discriminatory. (Durham Aff. at ¶ 8).

The Team Lead position ultimately went to Kristin Morrow[3] who was selected out of six potential candidates because she was the most qualified. (Durham Aff. at ¶ 12;

_____

[3] Ms. Morrow was born in 1972, and her race is White. (Durham Aff. at ¶ 12).

Seijo Aff. at ¶ 11, Exh. A).   Mr. Williams admitted that he was unaware of who had been selected for the position, who decided to promote Ms. Morrow to the position, or whether Ms. Morrow was more qualified than he was for the position. (Pl. at 221-24).   While Mr. Williams was not eligible for the position because he was on a Thirty Day Plan, even if he was not on a Thirty Day Plan, Moffitt managers affirmed that he would not have been promoted because he was not qualified in the areas of Customer Focus and Team Work.   (Durham Aff. at ¶ 12, Exh. G; Seijo Aff. at ¶ 11).   The position for which Mr. Williams applied required good communication skills and the ability to develop and maintain positive relationships with internal and external customers.   (Seijo Aff. at ¶ 11, Exh. A).

**F.   Mr. Williams' Termination**

Pursuant to the Thirty Day Plan, Dr. Huang and Mr. Seijo met with Mr. Williams every week.   (Pl. at 190-91; Seijo Aff. at ¶ 7).   At these weekly meetings, Mr. Williams refused to acknowledge the issues regarding his behavior that led to the issuance of his Thirty Day Plan.   (Seijo Aff. at ¶ 7).   Mr. Williams did not demonstrate improvement.

<u>Id.</u>  For example, on October 16, 2006, Mr. Williams confronted Dr. Huang, in front of Ms. Fernandez and other employees, to complain that Ms. Fernandez did not do her share of the work.  (Seijo Aff. at ¶ 8, 9).  Additionally, on September 28, 2006, Mr. Williams chose to attend a class outside the lab and failed to notify Dr. Huang, in direct violation of the Thirty Day Plan instruction to discuss any project that would re-prioritize his work assignments with his management team.  (Exh. 16 at 2).

After four weekly meetings, on October 23, 2006, Moffitt terminated Mr. Williams' employment, citing his improper conduct and failure to show improvement during his Thirty Day Plan.  (Pl. at 191-92, Exh. 17, 18, 19, 20; Durham Aff. at ¶ 9; Seijo Aff. at ¶ 10).  Before Mr. Williams' termination, Dr. Huang and Mr. Seijo again consulted with Ms. Durham.  (Durham Aff. at ¶ 9; Seijo Aff. at ¶ 10).  They reviewed his performance over the prior thirty days and decided that his insufficient improvement warranted termination.  (Durham Aff. at ¶ 9; Seijo Aff. at ¶ 10).

Three other Moffitt employees were terminated for the

same reason in 2006-- namely, failure to improve performance during a Thirty Day Plan. (Durham Aff. at ¶ 9). Those employees were Elizabeth Allen, Joerg Karolat, and Madhavi Sekharam.[4] <u>Id.</u>

## II.  <u>Mr. Williams' Amended Complaint</u>

Mr. Williams filed his pro se Amended Complaint on November 30, 2009, in which he alleged a hostile work environment claim (Count I), a retaliation claim (Count II), a disparate treatment claim (Count III), and various discrimination claims (Counts IV, V). (Doc. # 16). Each claim is discussed below.

### A.  <u>Count I - Hostile Work Environment Claim</u>

Mr. Williams claims that Mr. Seijo and Dr. Huang created a hostile work environment by not responding to his greetings, by greeting and hugging Ms. Fernandez, and by having "hushed and private conversations" with Ms. Fernandez. (Pl. at 208-11; Doc. # 16 at 15). Mr. Williams also asserts that Dr. Huang created a hostile work

---

[4] Ms. Allen was born in 1967, her race is White, and she was terminated on July 14, 2006; Mr. Karolat was born in 1963, his race is White, and he was terminated on July 12, 2006; and Ms. Sekharam was born in 1955, her race is Asian, and she was terminated on November 6, 2006. (Durham Aff. at ¶ 9).

environment with her facial expressions,[5] and by requesting to meet with Ms. Fernandez and Mr. Williams separately to discuss whether they were satisfied with working with one another. (Pl. at 205-06). According to Mr. Williams, Dr. Huang wanted "to create friction in the lab between [him and Ms. Fernandez]." (Pl. at 206).

**B.  Count II - Retaliation Claim**

Mr. Williams claims that he was retaliated against after he sent an e-mail report directly to Moffitt upper management during April or May of 2006 regarding the possible contamination of blood collection tubes at Moffitt. (Pl. at 165-70; Doc. # 16 at 16-17). Although Moffitt conducted an investigation regarding Mr. Williams' report and determined that there was no contamination, Mr. Williams later was commended in his Annual Evaluation for taking the initiative to make the report. (Pl. Exh. 10). Mr. Williams failed to identify what retaliatory action he suffered after reporting this matter. (Pl. at 176-78).

---

[5] For example, in his Amended Complaint, Mr. Williams stated that "[w]henever Ms. Huang came to the lab, her expressions hardened upon seeing [me] as if facing an adversary in a boxing ring . . . [i]t terribly hurt [my] feelings." (Doc. # 16 at 15).

### C.   <u>Count III - Disparate Treatment Claim</u>

Mr. Williams states that Ms. Fernandez received a more favorable work schedule and lighter work load than he did, and he alleges that she received a better evaluation score and raise.  (Doc. # 16 at 17- 18).  He also asserts that Ms. Fernandez received "protect[ion] from doing late samples." (Doc. # 16 at 18).

It is Mr. Williams' belief that Ms. Fernandez received a 3.75 performance rating on her Annual Evaluation while he received a 3.5 performance rating.  (Pl. at 127, 135; Doc. # 16 at 18).  He also claims that as a result of the 3.75 performance rating, Ms. Fernandez received a four percent salary increase while he only received a three percent salary increase.  (Pl. at 127-28, 135-36; Doc. # 16 at 18). However, contrary to Mr. Williams' understanding, Ms. Fernandez's Annual Evaluation reflects that Ms. Fernandez received an overall performance rating of 3.5 (the same score Mr. Williams received) and also received a three percent salary increase (the same increase awarded to Mr. Williams).  (Durham Aff. at ¶ 10, Exh. D).

Finally, Mr. Williams claims that he was subjected to disparate treatment because he did not get a bonus for 2006,

-11-

while others did.  (Pl. at 137; Doc. # 18).  However, Mr. Williams could not identify any employee who received a bonus. (Pl. at 138-43).  In actuality, Moffitt awarded a bonus of 1.5% to all eligible employees on November 3, 2006. (Durham Aff. at ¶ 11, Exh. F).  Mr. Williams was ineligible for this bonus because he was not employed with Moffitt at the time the bonus was paid out.[6]  (Durham Aff. at ¶ 11, Exh. E.)

### D.   Discrimination Claims

#### 1. Count IV - Alleged Age Discrimination

Age discrimination occurred, according to Mr. Williams, because he was placed on the Thirty Day Plan without any reason and only to prevent his promotion to the Team Lead position.  (Pl. at 89-90; Doc. # 16 at 18).  Additionally, it is Mr. Williams' belief that Dr. Huang and Mr. Seijo made discriminatory comments about his age.   (Pl. at 91). Specifically, Mr. Williams testified that Dr. Huang asked him "Are you [in your] late 50s?" and Mr. Williams responded, "Yes, I am [in my] late 50s." (Pl. at 90).  Mr.

---

[6] Moffitt terminated Mr. Williams' employment on October 23, 2006, before the bonuses were paid out. (Pl. at 191-92, Exh. 17, 18, 19, 20; Durham Aff. at ¶ 9; Seijo Aff. at ¶ 10).

Williams also testified that Dr. Huang told Mr. Seijo "this man [Mr. Williams] can work for four or five more years and can get the benefit of two years salary benefit . . . whereas, we have to wait for . . . 22, 24 years to get the same benefit." (Pl. at 90-91; Doc. 16 at 18). Mr. Williams also claims that Dr. Huang called him "an old black liar." (Pl. at 97). According to Mr. Williams, Dr. Huang made this comment on or about October 15 or 16, 2006. (Pl. at 98). Mr. Williams did not report these alleged comments to anyone at Moffitt. (Pl. at 153).

### 2. Alleged Gender Discrimination

Mr. Williams makes a gender discrimination claim based on a comment Dr. Huang allegedly made in July of 2006. (Pl. at 109-10). Mr. Williams claims that he suggested to Dr. Huang that he and Ms. Fernandez work alternate schedules to process the late samples, which were usually delivered to the lab between 7:30 and 8:00 p.m., to which Dr. Huang allegedly responded, "[Ms. Fernandez] is a woman. She cannot do that. How can you say -- being an Indian, how can you say that a woman can work like that? A woman cannot work in the evening . . . And also she has a kid. She has to go pick up the kid." (Pl. at 108-09; Doc. # 16 at 19).

Mr. Williams did not report this alleged comment to anyone at Moffitt. (Pl. at 153).

### 3. __Alleged National Origin Discrimination__

Mr. Williams claims that Ms. Fernandez told him that Mr. Seijo and Dr. Huang told her that Mr. Williams would handle the additional work in the lab because he is "Indian and people from India do a lot of work." (Pl. at 93; Doc. # 16 at 19). According to Mr. Williams, Ms. Fernandez said this to him once, sometime between January and May of 2006. (Pl. at 93-94). Mr. Williams admits that neither Dr. Huang nor Mr. Seijo directly made this comment to him. (Pl. at 113). Mr. Williams never reported this comment to anyone at Moffitt. (Pl. at 152).

Additionally, after Mr. Williams received his Annual Evaluation, he was instructed to attend two Organizational Behavior classes. (Pl. 113, Exh. 9, 10). Mr. Williams alleges that when he told Dr. Huang that he did not need to attend the classes because he had a master's degree in psychology, Dr. Huang responded, "Nobody here cares about your Indian education and Indian psychology." (Pl. at 113-14).

-14-

### 4. Alleged Race Discrimination

Mr. Williams claims that Ms. Fernandez was given special treatment, specifically by Mr. Seijo, because she was Hispanic and he was not. (Pl. at 117, 125; Doc. # 16 at 19). Particularly, Mr. Williams asserts that he was given more work in January, March and May 2006. (Pl. at 118). As an example, he states that he processed more late samples than Ms. Fernandez. (Pl. at 118). However, Mr. Williams admitted that Moffitt's records "may not" reflect that he was doing more work than Ms. Fernandez. (Pl. at 126).

At Mr. Seijo's direction, Dr. Huang reviewed the log books of the samples processed by Ms. Fernandez and Mr. Williams and compiled a chart for Mr. Seijo's review. (Seijo Aff. at ¶ 8). The data indicates that Ms. Fernandez and Mr. Williams often processed the same number of samples, and that sometimes Ms. Fernandez processed even more samples than Mr. Williams. (Seijo Aff. at ¶ 8).

Finally, Mr. Williams claims that he was subjected to race discrimination because he did not get a bonus for 2006. (Pl. at 137). However, as mentioned previously, all Moffitt employees received a 1.5% bonus on November 3, 2006. (Durham Aff. at ¶ 11, Exh. F). Mr. Williams did not receive

-15-

the bonus because he was no longer employed with Moffitt. (Durham Aff. at ¶ 11, Exh. E).

### 5. <u>Alleged Color Discrimination</u>

Mr. Williams' color discrimination claim is based solely on Dr. Huang's (unreported) comment, in which she allegedly called Mr. Williams "an old black liar." (Pl. at 145).

### 6. <u>Alleged Religious Discrimination</u>

Mr. Williams' religious discrimination claim is based on his belief that his coworkers and supervisors at Moffitt perceived him to be a Muslim. (Pl. at 150-51). Mr. Williams claims that Dr. Huang asked him whether he had another name "like Mohammed or Abraham," to which Mr. Williams responded, "That's a Muslim name. I am a Christian." (Pl. at 147, 149; Doc. # 16 at 19). Mr. Williams did not report Dr. Huang's alleged question to anyone at Moffitt. (Pl. at 151). Mr. Williams also claims that Dr. Huang asked him whether he ate meat or pork. (Pl. at 148-49; Doc. # 16 at 19). Mr. Williams stated that he "laughed" when Dr. Huang asked him this question and that he never reported the comment to anyone at Moffitt. (Pl. at 152). Finally, Mr. William asserted that someone called his

home and asked for "Mohammed." (Doc. # 16 at 19). Mr. Williams alleged that his wife answered and "identified Ms. Huang's voice when they later met in a super store." (Doc. # 16 at 19).

### III. <u>Legal Standard</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996)(citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642,

646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of

<u>Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta</u> <u>Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)).   However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.   <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981), <u>cert.</u> <u>denied</u>, 456 U.S. 1010 (1982).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).   Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).   Factual disputes that are irrelevant or unnecessary will not be counted.   <u>Id.</u> at 248.

**IV.   <u>Analysis</u>**

   **A.   <u>Hostile Work Environment Claim</u>**

      **1.   <u>Standard</u>**

Relying on the Amended Complaint, Mr. Williams bases his hostile work environment claim on allegations of

-19-

ostracism[7] and perceived surveillance. (Pl. at 205, 208-09). To prove a prima facie case of hostile work environment, Mr. Williams must establish that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment; and (5) a basis exists for holding Moffitt liable. Gupta v. Fla. Board of Regents, 212 F.3d 571, 582 (11th Cir. 2000) (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), cert. denied, 531 U.S. 1076 (2001)).

### 2.   **No Severe or Pervasive Conduct**

Whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is crucial in determining whether a plaintiff has proven a hostile work environment claim. Gupta, 212 F.3d at 583. A hostile work

---

[7] For example, Mr. Williams asserts that "[w]henever Ms. Huang came to the lab, her expressions hardened on seeing [Mr. Williams] as if facing an adversary in a boxing ring. She looked at [Mr. Williams] with rage burning in her eyes; never acknowledge[d] his greetings; and ignored his presence." (Doc. # 16 at 48).

environment exists only where the work environment is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)(internal citations omitted). Even if the plaintiff is able to prove one factor in the prima facie case, this "does not compensate for the absence of the other factors." Mendoza, 195 F.3d at 1248.

To establish the threshold of severity or pervasiveness, both an objective and subjective component must be present. Mendoza, 195 F.3d at 1246. In assessing the objective component, four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Id.

Mr. Williams offers no evidence to support his contention that the alleged ostracism was related to any protected characteristic. Even if the Court assumes that the alleged ostracism was somehow related to a protected

characteristic, it does not rise to the level required by Mendoza and its progeny. NAACP v. Fla. Dep't of Corr., No. 5:00-cv-100-Oc-10GRJ, 2004 U.S. Dist. LEXIS 28348, at *25 (M.D. Fla. July 6, 2004)("Perceived ostracism and rudeness by coworkers is simply not sufficient, standing alone, to demonstrate a violation of Title VII by the employer."); McMillan v. Regeneration Techs., Inc., 243 F. Supp. 2d 1324, 1330 (M.D. Fla. 2002) (same).

Additionally, although Mr. Williams does not point to Dr. Huang and Mr. Seijo's alleged comments as a basis for his hostile work environment claim, the Court will nevertheless address this issue, as remarks are often considered in the hostile work environment context. Mr. Williams mentions the following alleged remarks: (1) Ms. Fernandez told Mr. Williams that both Dr. Huang and Mr. Seijo commented to Ms. Fernandez that Mr. Williams could handle additional work because he was Indian; (2) Dr. Huang asked Mr. Williams whether he had another name like "Mohammed or Abraham" and whether he ate meat or pork; (3) In response to Mr. Williams' comment that he did not need to attend Organizational Behavior courses, Dr. Huang said "nobody cares about your Indian education and Indian

-22-

psychology"; (4) Dr. Huang commented that Ms. Fernandez could not work in the evenings because she was female; (5) Dr. Huang asked Mr. Williams if he was in his fifties and commented regarding his eligibility for a salary benefit; and (6) Dr. Huang called Mr. Williams an "old black liar."

Conduct far more severe or pervasive than what Mr. Williams has alleged here has failed to meet the threshold of proof required in the Eleventh Circuit. See e.g., Godoy v. Habersham County, 211 Fed. Appx. 850, 853-854 (11th Cir. 2006) (summary judgment affirmed where South-American plaintiff claimed he was subject to racial slurs "almost every shift," and that his supervisor battered him and told him "to go back to his boat and sail to South America where he belongs"); Barrow v. Ga. Pacific Corp., 144 Fed. Appx. 54, 57 (11th Cir. 2005) (summary judgment affirmed where black employee claimed his superintendent told him several times that he was "going to kick [his] black ass"; witnessed numerous other forms of racially offensive conduct and comments; saw the rebel flag on tool boxes and hard hats and "KKK" on the bathroom wall and on a block console; saw a noose in another employee's locker; was called a "nigger" by his supervisor and told he would be "cut" if he looked at

"that white girl"; and was called "black boy" and "dumb ass" by two other supervisors); <u>Williams v. JPI Jones Pharm.</u>, No. 8:03-cv-2561-T-30MAP, 2005 U.S. Dist. LEXIS 15429, at *4 (M.D. Fla. Jul. 29, 2005) (summary judgment granted where plaintiff alleged that co-workers made derogatory racial jokes and her supervisor remarked that she had "too many blacks in her department"); <u>Lawrence v. Wal-Mart Stores, Inc.</u>, 236 F. Supp. 2d 1314, 1318-19, 1325 (M.D. Fla. 2002) (summary judgment granted where manager made threats to an African-American employee such as "I have that gun [like the one that was missing from the store] at home along with several more at home just like it to shoot blacks," while patting him on the back, and explaining during another occasion after plaintiff received positive feedback from upper management "we don't like heroes . . . remember how we did blacks back in the thirties when they got out of hand . . . we would take them out back and lynch them"; plaintiff was also told he was a "Jesse Jackson type black guy" and referred to as "homeboy" and "boy" on a couple of occasions).

Additionally, Mr. Williams admitted that he received a copy of Moffitt's Employee Handbook, which detailed the

-24-

organization's policies prohibiting discrimination and harassment, and outlined the complaint procedure for reporting such conduct. (Pl. at 85-86, 153-159, Exh. 7, 12). Mr. Williams also admitted that he knew that he could report discrimination or harassment to Moffitt's Human Resources Department. (Pl. at 198). Despite this, Mr. Williams admitted that he never reported any of the alleged ostracism, surveillance or comments to Human Resources. (Pl. at 151-53); Fleming v. Boeing Co., 120 F.3d 242, 246 (11th Cir. 1997) (holding that even if a hostile work environment exists, the plaintiff still needs evidence that the employer was liable).

In light of the requirements needed to establish severe or pervasive conduct, Mr. Williams' allegations of ostracism and claims of inappropriate comments that occurred, on average, less than one time per month, do not meet the Mendoza standard. Mendoza v. Borden Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). Accordingly, Mr. Williams has failed to prove a prima facie case for hostile work environment.

**B.   Retaliation Claim**

   **1.   Standard**

It is a plaintiff's burden to establish that he was

treated in a retaliatory manner. <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266 (11th Cir. 2001). In order to establish a prima facie case of retaliation, Mr. Williams must prove: (1) that he engaged in protected activity; (2) that Moffitt took an adverse employment action against him; and (3) that there was a causal link between the protected activity and the adverse employment action. <u>Id.</u>

Even if the plaintiff can establish a prima facie case of retaliation, the employer can rebut this showing by producing evidence of a legitimate, non-retaliatory business reason for its action; an "exceedingly light" burden. <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). "The burden [then] returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for [retaliation]." <u>Carter v. City of Miami</u>, 870 F.2d 578, 584 (11th Cir. 1989). To establish pretext, it is the plaintiff's burden to establish "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Springer v. Convergys Customer Mgmt. Group, Inc.</u>, 509 F.3d 1344, 1348-49 (11th Cir. 2007)

(internal citations omitted).

### 2.   **Alleged Protected Activity**

In his Amended Complaint, Mr. Williams identifies his alleged protected activity as his May 2006 e-mail report regarding potentially contaminated blood collection tubes at Moffitt. (Doc. # 16 at 53). Mr. Williams claims that subsequently, he was "favorably commended," but also "wrongly remarked" in his Annual Evaluation. (Doc. # 16 at 54; Pl. Exh. 10). In the Quality Control section of the Annual Evaluation, the evaluators thanked Mr. Williams for alerting Moffitt about this possible issue, but requested that he remember the proper chain of command.[8] (Pl. Exh. 10). Mr. Williams fails to present any evidence that this overall favorable observation in the Annual Evaluation had any adverse impact on him. In fact, Mr. Williams received a score of four out of five in the Quality Control section of the Annual Evaluation, his highest score in any area. (Pl. Exh. 10).

Additionally, Mr. Williams appears to allege that he engaged in protected activity when he went to Human

---

[8] Mr. Williams made his report directly to higher management, without first notifying his direct supervisors. (Pl. at 169, Exh. 10).

-27-

Resources to assert that Dr. Huang and Mr. Seijo placed him on the Thirty Day Plan in order to block him from receiving the Team Lead position.  However, it is uncontested that Dr. Huang, Mr. Seijo and Ms. Durham made the decision to place Mr. Williams on the Thirty Day Plan on September 5, 2006, before he applied for the Team Lead position on September 18, 2006.  (Pl. at 33, Durham Aff. at ¶ 5, Seijo Aff. at ¶ 5).  As such, Mr. Williams' application for the Team Lead position could not possibly have motivated the Thirty Day Plan.  See, e.g., Saffold v. Special Counsel, Inc., 147 Fed. Appx. 949, 951 (11th Cir. 2005) ("When an employer makes a tentative decision before protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation."); Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1204 (M.D. Fla. 2007) (no causal connection where decision to place plaintiff on performance improvement plan was made prior to plaintiff's complaint); Bailey v. Town of Lady Lake, No. 5:05-cv-464-Oc-10-GRJ, 2007 U.S. Dist. LEXIS 41512, at *17-18 (M.D. Fla. June 7, 2007) ("It would defy logic to find that adverse actions which took place several months before any protected activity could somehow be causally

related to each other.").

Finally, in order to constitute a protected activity, a plaintiff must, at the very least, tell his employer that he believes that illegal discrimination is occurring. <u>Webb v. R & B Holding Co.</u>, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998) ("It is not enough for the employee merely to complain about a certain policy or certain behavior . . . and rely on the employer to inter that discrimination has occurred."); 42 U.S.C. § 2000e-3(a); § 760.10(7), Fla. Stat.; <u>Marcelin v. Eckerd Corp. of Fla., Inc.</u>, No. 8:04-cv-491-T-17MAP, 2006 U.S. Dist. Lexis 18097, at *26-29 (M.D. Fla. April 10, 2006) (no protected activity when plaintiff failed to "communicate her belief that illegal discrimination [was] occurring.") (emphasis added)).

Here, Mr. Williams did nothing more than: (i) point out a possible contamination issue which was found to not have occurred; and (ii) indicate that he thought his Thirty Day Plan was unfair.   Notably, he failed to allege discrimination based on any protected status.   Accordingly, Mr. Williams cannot establish a prima facie case of retaliation.

-29-

C.   **Disparate Treatment Claim**

1.   **No Similarly Situated Employee**

In his disparate treatment claim, Mr. Williams alleges that Ms. Fernandez received a more favorable work schedule and a lighter work load, and alleges that she received a better evaluation score and related raise.  (Doc. # 16 at 58, 59).   In order to establish a prima facie case for disparate treatment, Mr. Williams must prove that he: (1) belongs to a protected class; (2) suffered an adverse employment action; and (3) was treated less favorably than similarly situated employees outside of the protected class. Martin v. Rumsfeld, 137 Fed. Appx. 324, 325 (11th Cir. 2005).   "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997).

Ms. Fernandez, the only alleged comparable employee offered by Mr. Williams, is not similarly situated.   Mr. Williams was employed as a Research Assistant, and his job description included assisting the Research Associate.   In contrast, Ms. Fernandez was employed as the Research Associate.   Because Mr. Williams and Ms. Fernandez are not

-30-

similarly situated (they did not hold the same job), any attempt to compare their work assignments or work schedules fails as a matter of law.  See <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1280 (11th Cir. 2008); <u>Holifield</u>, 115 F.3d at 1562.

### 2.   <u>Same Treatment Regarding Score and Raise</u>

Finally, Mr. Williams is simply wrong about the Annual Evaluations.  While Mr. Williams alleges that Ms. Fernandez was awarded a higher evaluation score and raise, Ms. Fernandez received the exact same score as Mr. Williams (3.5) and the exact same raise as Mr. Williams (3%). (Durham Aff. at ¶ 10, Exh. D).  There is no evidence of disparate treatment.

### D.   <u>Discrimination Claims</u>

### 1.   <u>Alleged Age Discrimination</u>

Mr. Williams alleges that he was subjected to age discrimination when he was not promoted to the Team Lead position. (Doc. # 16 at 62).  The elements of a prima facie case of age discrimination in the promotion context require a plaintiff to prove that: (1) he is a member of a protected class; (2) he was qualified for and applied for the job; (3) he was rejected; and (4) the promotion was given to a

substantially younger individual.  Benson v. Tocco, 113 F.3d
1203, 1207-08 (11th Cir. 1997); Gordon v. Pall Aeropower
Corp., No. 97-1749-CIV-T-25 B, 1998 U.S. Dist. LEXIS 20987,
at *7 (M.D. Fla. Dec. 3, 1998), aff'd without opinion, 194
F.3d 1324 (11th Cir. 1999).  Under the Age Discrimination in
Employment Act, an employee must show that the adverse
employment action would not have occurred but for the
employer's discriminatory motive.  Gross v. FBL Fin. Servs.,
Inc., 129 S. Ct. 2343, 2350 (2009).

Moffitt has presented a number of reasons why Mr.
Williams was not promoted to the Team Lead position.  First,
Mr. Williams was not qualified for the Team Lead position
because he was on a Thirty Day Plan.  Moffitt's legitimate
non-discriminatory written policy states that an employee is
ineligible to be considered for a new position if he has
received written disciplinary counseling in the prior six
months.  (Durham Aff. at ¶ 12, Exh. G).

Second, even if Mr. Williams had not been placed on a
Thirty Day Plan, Moffitt presented another legitimate non-
discriminatory reason why Mr. Williams did not qualify for
the Team Lead position.  Moffitt asserts that Mr. Williams
was not qualified for a supervisory position that required

good communication skills and the development and maintenance of positive relationships with internal and external customers.   (Seijo Aff. at ¶ 11).

Third, the record is undisputed that Ms. Morrow was considered the best qualified candidate of the six applicants for the position. (Seijo Aff. at ¶ 11). "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." <u>Evans v. Techs. Applications</u>, 80 F.3d 954, 960 (4th Cir. 1996).   Although Mr. Williams believed that he was "perfect" for the position, "under the [Age Discrimination in Employment Act], an employer may place more value on any job-related qualification it chooses, so long as it does not discriminate against a protected individual on account of age." <u>Hill v. Augusta County Sch. Bd.</u>, 636 F. Supp. 2d 492, 495 (W.D. Va. 2009) (finding that the employer was free to select the applicant the employer felt was best suited for the position on any ground other than a discriminatory one and viewing the successful candidate as more of a "team player" and the plaintiff/unsuccessful candidate as "hard to manage" were legitimate, non-discriminatory reasons for the selection of

-33-

the chosen candidate).  As such, his age discrimination claim fails.

> **2.  Alleged Gender, Color, and Religious Discrimination Claims are Barred for Failure to Exhaust Administrative Remedies**

Mr. Williams' claims of intentional gender, color and religious discrimination, presumably under Title VII and the Florida Civil Rights Act, are barred because Mr. Williams failed to exhaust his administrative remedies on these claims.  To pursue these claims, Mr. Williams must have filed a charge asserting them within 300 days of the challenged conduct under Title VII and within 365 days under the Florida Civil Rights Act.  42 U.S.C. § 2000e-5(e)(1); §760.11(1), Fla. Stat.

It is undisputed that Mr. Williams did not assert these claims in his March 15, 2007, Charge of Discrimination. (Pl. Exh. 14).  A plaintiff's complaint is limited by the scope of the Equal Employment Opportunity Commission investigation that reasonably can be expected to grow out of the charge of discrimination, and the court should dismiss a lawsuit to the extent it exceeds the scope of the allegations in the charge.  <u>Hillemann v. Univ. of Cent. Fla.</u>, 411 F. Supp. 2d 1354, 1364 (M.D. Fla. 2004) (granting

summary judgment on gender and race claims where charge only included age claim); see also Chanda v. Englehard/ICC, 234 F.3d 1219, 1225 (11th Cir. 2000); Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d 1355, 1365 (S.D. Fla. 2001), aff'd, 265 F.3d 1066 (11th Cir. 2001).

Here, Mr. Williams cannot complain to the Equal Employment Opportunity Commission of certain instances of discrimination (race, national origin, age discrimination and retaliation) and now seek judicial relief for different instances of discrimination (gender, color and religion). Therefore, his gender, color and religious discrimination claims are dismissed as a matter of law.

### 3. Alleged Race and National Origin Discrimination

A prima facie case of discrimination based on race or national origin requires proof that the plaintiff: (1) is a member of a protected class; (2) was qualified for his job; (3) an adverse employment action was taken against him despite his qualifications; and (4) his employer treated similarly situated employees outside his classification more favorably. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Mr. Williams alleges that he was subjected to discrimination when he was terminated. (Doc. # 16). However, he fails to identify any employee who received more favorable treatment than him with respect to termination. "A plaintiff fails to establish a prima facie discrimination case if she is replaced by a person in her protected class or fails to show that she was treated less favorably than a similarly-situated person outside her protected class." Richardson v. Ala. Pine Pulp Co., 277 Fed. Appx. 907, 909 (11th Cir. 2008)); see also Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (same).

In this case, Moffitt terminated Mr. Williams after he failed to improve his performance during his Thirty Day Plan. (Durham Aff. at ¶ 9). Mr. Williams failed to provide any evidence of comparable employees that were treated more favorably (e.g., employees that were not terminated after failing to improve their performance during a Thirty Day Plan). In contrast, Moffitt has presented undisputed evidence that other employees were terminated in 2006 for the identical misconduct that led to Mr. Williams' termination -- failure to improve their performance while they were on a Thirty Day Plan. (Durham Aff. at ¶ 9).

-36-

These other individuals were all of different ages, genders, and races.  Id.  Because Mr. Williams failed to establish a comparable employee, his discrimination claim fails.

**V.   Conclusion**

For the foregoing reasons, summary judgment is warranted here, where there is no genuine issue as to any material fact, where no reasonable factfinder could find in favor of Mr. Williams, and where Moffitt is entitled to judgment as a matter of law on all claims asserted by Mr. Williams.  Despite the fact that the allegations of a pro se filer, like Mr. Williams, are held to a less stringent standard than formal pleadings drafted by lawyers, even with the benefit of this "liberal construction" Mr. Williams fails to set forth evidence which precludes the entry of summary judgment.  Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007).  Moffitt's Motion for Summary Judgment (Doc. # 29) is granted.  Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   H. Lee Moffitt Cancer and Research Institute, Inc.'s Dispositive Motion for Summary Judgment (Doc. # 29) is **GRANTED**.

(2)   The Clerk is directed to enter judgment in favor of H.

-37-

Lee Moffitt Cancer and Research Institute, Inc., and **CLOSE THIS CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>6th</u> day of December 2010.



VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies:

All Counsel and Parties of Record